UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORTECH S.R.L.,

    Plaintiff

-vs-

MOTOR CONSULTANTS OF
AMERICA, INC.,

    Defendant.

Case No: 2:22-cv-11648

Hon. George Caram Steeh
Magistrate Judge Curtis Ivy Jr.

## **DEFENDANT'S EMERGENCY MOTION FOR PROTECTIVE ORDER**

Pursuant to Fed. R. Civ. P. 26(c), Defendant/Counter-Plaintiff Motor Consultants of America, Inc. ("MCA") files this Motion for Protective Order because the discovery is sought to oppress or embarrass MCA and would expose MCA to unfair competition. MCA relies on the supporting brief.

Counsel for MCA attempted to confer in good faith with Fortech's counsel, but was unable to obtain concurrence. On February 12, 2024, MCA's counsel notified Fortech's counsel that it would file a motion for protective order if Fortech continued to seek discovery into MCA's post-termination code/work. (Ex. 1, Email Chain.) On February 13, 2024, counsel for the parties exchanged further emails. (*Id.*) On February 21, 2024, MCA's counsel asked again for a meet and confer, or to confirm Fortech was withdrawing any further efforts. (*Id.*) On February 23, 2024,

1

Fortech's counsel stated he was "in receipt of your request for a 'meet and confer' and have forwarded it on to my client contact for its input." (*Id.*) He further stated that, due to vacations for him and Fortech's other counsel, they would not be available for the meet and confer (again, in quotation marks) until the later part of March 11th (three weeks later). (*Id.*) The same day, Fortech filed its response to MCA's objections to the Magistrate Judge's Order Granting Fortech's Second Motion to Compel in which it insisted its interpretation was correct. Fortech's counsel knew that it was likely this Court would rule on MCA's objections before a meet and confer. Given that the Court may rule on those objections and such a ruling could order production of MCA's proprietary work without the opportunity to consider this Motion for Protective Order, Defendant files this Emergency Motion.

WHEREFORE, MCA respectfully requests that this Court 1) prohibit further discovery into MCA's post-termination documents or, in the alternative, 2) order that any further post-termination document production and discovery be protected under an AEO designation.

Respectfully submitted,
MYERS & MYERS, PLLC
Attorneys for Defendant/Counter-Plaintiff

Dated: March 13, 2024      /s/ Kristyn R. Mattern
                                           Kristyn R. Mattern (P77548)
                                           915 N. Michigan Ave., Suite 200
                                           Howell, Michigan 48843
                                           (517) 540-1700

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| FORTECH S.R.L.,<br><br>    Plaintiff<br><br>-vs-<br><br>MOTOR CONSULTANTS OF<br>AMERICA, INC.,<br><br>    Defendant. | Case No: 2:22-cv-11648<br><br>Hon. George Caram Steeh<br>Magistrate Judge Curtis Ivy Jr. |

## BRIEF IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION FOR PROTECTIVE ORDER

Defendant/Counter-Plaintiff Motor Consultants of America, Inc. ("MCA"), by and through its counsel, Myers & Myers, PLLC, and for its Emergency Motion for Protective Order, hereby submits the following as its Brief in Support thereof.

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ...................................................4

STATEMENT OF CONTROLLING AUTHORITY .........................................5

RELEVANT FACTUAL BACKGROUND ...................................................6

    A.  MCA is a Research, Development and Strategic Leader In the Construction Industry. ........................................................6

    B.  MCA's DCI Construction® Software Is The Culmination of Decades Of Expertise On Which Fortech Worked On a Small Portion. ...........................10

    C.  MCA's Post-Termination Work On the Module Is Inextricably Linked To The Greater DCI Construction® Software. ................................12

    D.  Fortech Is Now Part of A Multi-National Foreign Conglomerate And Directly Competes With MCA in Software Development Within the Construction Industry In The United States. ................................14

RELEVANT PROCEDURAL HISTORY ..................................................16

LEGAL STANDARD ....................................................................18

ARGUMENT ...........................................................................19

    A.  This Court Should Preclude Any Further Post-Termination Production. ...................................................19

    B.  If This Court Finds That Any Remaining Post-Termination Discovery Is Required, It Should Order The Production To A Third Party Expert under An AEO Designation. ..............................................20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Deloitte Tax LLP v. Murray*, No. 1:20-CV-02487, 2022 U.S. Dist. LEXIS 81243, at *19 (N.D. Ohio May 4, 2022) ................................................................. 21, 22

*Encompass Pet Group, LLC v. Allstar Prod Group, LLC*, 2023 U.S. Dist. LEXIS 7024, at *12 (E.D. Mich., Jan. 13, 2023) ...........................................................19

*Flagg v. City of Detroit,* No. 05-74253, 2010 U.S. Dist. LEXIS 78501, 2010 WL 3070104, at *3 (E.D. Mich. Aug. 4, 2010).........................................................19

*Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir., 2001) .............................................18

*Ross-Hime Designs, Inc. v. United States*, 109 Fed. Cl. 725, 731 (2013)..............21

*Stout v. Remetronix, Inc.*, 298 F.R.D. 531, 535 (S.D. Ohio, 2014) ........................20

*United States ex rel. Daugherty v. Bostwick Labs*., No. 1:08-cv-354, 2013 U.S. Dist. LEXIS 89683, 2013 WL 3270355, at *2 (S.D. Ohio June 26, 2013) .. 20, 21

*Vignes-Starr v. Lowe's Home Ctrs.*, 544 F. Supp. 3d 774, 776 (W.D. Ky. 2021)...21

**Statutes**

50 U.S.C.S. § 1709...................................................................................................24

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................19

## <u>STATEMENT OF ISSUES PRESENTED</u>

1. Whether this Court should prohibit further discovery in MCA's post-termination systems and software because such discovery is harassing, oppressive, and would unfairly expose MCA to competitive harm?

MCA answers: Yes
Fortech would answer: No
This Court should answer: Yes

2.      Or, in the alternative, whether this Court should only authorize access or further disclosure of post-termination systems and software to a third-party expert witness for evaluation and opinions related to same?

MCA answers: Yes
Fortech would answer: No
This Court should answer: Yes

## <u>STATEMENT OF CONTROLLING AUTHORITY</u>

MCA relies on the Federal Rules of Civil Procedure 26(c), and the authorities cited in its Brief.

## RELEVANT FACTUAL BACKGROUND

**A.     MCA is a Research, Development and Strategic Leader In the Construction Industry.**

MCA provides operational, executive, and managerial services to customers across a variety of industries including construction, manufacturing, distribution, automotive, healthcare, banking and financial institutions. (ECF 13-2 at PAGEID.70, ¶5.)  Dr. Parviz (Perry) Daneshgari founded MCA in 1990 with services focused on implementing process and product development and to reduce waste and increase productivity. (Ex. 2, Declaration.) He specializes in and developed Agile Construction®, which is a philosophy and methodology that focuses on adaptation and quick changes in job sites and project delivery, specifically for the construction industry. (*Id*. at ¶6.) The "agile" methodology is used in different iterations within the manufacturing, automotive, and software development industries. (*Id*. at ¶7.)

MCA is a leader of research, development, and process improvement within the construction industry, in particular. (*Id*. at ¶8.) Today, approximately one-third of MCA's revenue is invested in research and development. (*Id*. at ¶9.) Since its inception, MCA has worked directly with construction industry clients to make financial and organizational decisions, to optimize their framework and operations, and increase efficiency at every level of the organization and every stage of a project. (*Id*. at ¶10.) MCA is sought after for its unique industry knowledge and skilled

methodologies. (*Id.* at ¶11.) MCA is a published expert in this field. (*Id.* at ¶12.) As early as February 2002, Dr. Daneshgari published a report on productivity improvement principles used in various industries and what models might be useful in the electrical construction industry. (*Id.* at ¶13.) Electri International, an organization that provides research and education for the electrical construction industry, commissioned this research from Michigan State University. (*Id.* at ¶14.) Dr. Daneshgari led the research and authored the report. (*Id.* at ¶15.) It included interviewing decision makers in the electrical construction industry and others, including automotive, manufacturing, commercial airplane production, and retail, to identify the operational models used therein. (*Id.* at ¶16.) Dr. Daneshgari applied that research to the electrical construction industry to help those organizations streamline their operations and stay competitive. (*Id.* at ¶17)

In 2009, ASTM International adopted the Standard Practice for Job Productivity Measurement, which was a first-time standard to measure construction productivity that was developed by Dr. Daneshgari and Dr. Heather Moore from MCA, in conjunction with the National Institute of Standards and Technology. (*Id.* at ¶18.) ASTM International is a global organization that sets forth standards for safety and performance across industries, including construction. (*Id.* at ¶19; https://www.astm.org/about/overview/detailed-overview.html.) A manual (ASTM MNL 65) to accompany the standard for application was published by ASTM

International in 2012 and is used today to guide productivity, financial models, and other considerations in the construction industry. (*Id*. at ¶20.)

Electri International has continued to commission Dr. Daneshgari and/or MCA (along with some partners) for research and reports through the years. Here are just a few:

1. 2004 – The Impact of Variation on Electrical Contractor Profitability. (*Id*. at ¶21a.)  This research delved into the ways in which reducing variations (or six-sigma operation) has helped other industries lower cost and increase productivity. The study provided a methodology by which an electrical contractor could identify, measure and reduce variations. (*Id*.)

2. 2007 – Market Share: Developing a Standard Format to  Calculate Market Share. (*Id*. at  ¶21b.) This study was borne of a four-hour workshop conducted by MCA for the National Labor-Management Cooperation Committee in 2003, in which it was clear that no standard existed for how industry executives could calculate their market share. (*Id*.)  The research analyzed the methods of the time and developed a reliable method and common strategy that was widely adopted.

3. 2008 – Ideal Jobsite Inventory Levels to Improve Profitability. (*Id*. at ¶21c.)  This report examined methods of material management to increase productivity and decrease overall costs.

4. 2015, 2016, and 2017 – MCA published four books on the Industrialization of Construction®. (*Id*. at ¶21d.) "Industrialization" occurs when work is transferred from a human's knowledge to digitized explicit knowledge. (*Id*.) Industrialization of Construction® is a term coined by MCA that refers to the five stages for that construction organizations go through as they become industrialized. (*Id*.) Those are 1) management of labor; 2) management of work; 3) lean operations; 4) modeling and simulation; and 5) feedback based on other industries. (*Id*.) These four books offer ongoing research and suggestions for electrical contracting firms to develop full-scale operational models to maximize their success along these stages. (*Id*.)

5. 2020 - MCA studied Pre-fabrication and how it might be utilized in the electrical construction industry. (*Id*. at ¶21e.) MCA also created a tool to help contractors calculate the savings they might see to create a practical method for pricing estimates when using pre-fabrication methods. (*Id*.)

6. 2021 – Industrialization of Construction® Signal or Noise? Threat or Promise? (*Id*. at ¶21f.) MCA studied how Industrialization of Construction® will continue to unfold and created tools for electrical organizations to evaluate their position within that trajectory. (*Id*.)

Additionally, Dr. Daneshgari, Dr. Moore and other MCA executives have published articles in various publication for decades including, more recently:

1. The Paradox of Managing Large Jobs (2018) – published in IEC, Insights Magazine. (*Id*. at ¶22a.);

2. Scientists Vs. Artist: The Quest for Replicating Success (2021) – published in IEC, Insights Magazine. (*Id*. at ¶22b.);

3. The Secret to Better Project Control (2022). (*Id*. at ¶22c.);

4. Managing the Trust Costs of Change Orders (2022) – published by the Construction Financial Management Association. (*Id*. at ¶22d.)

**B.  MCA's DCI Construction® Software Is The Culmination of Decades Of Expertise On Which Fortech Worked On a Small Portion.**

MCA envisioned bringing its decades of construction industry research and expertise together into a software application that would allow its customers to explore complete project lifecycle management at the overall corporate and enterprise level. (*Id*. at ¶23.) This is the Digitalization Commonization Interconnection® or DCI Construction® software. (*Id*. at ¶24.) DCI Construction® would include management across all levels of a project and work environment, from Pipeline and Backlog, Procurement, Project Planning, Work Breakdown Structure, Project Scheduling, Manpower and Resource Planning, Project Execution, Daily Scheduling, Timesheets, Productivity Tracking, Progress Reporting, Financial Reporting and Project, Estimating Accuracy Enhancer, and more. (*Id*. at ¶25.) DCI Construction® is the first software of its kind offered within

10

the construction industry. (*Id*. at ¶26.) Its dollar value and potential, therefore, is impossible to calculate. (*Id*. at ¶27.)

MCA contracted with Fortech to develop the Pipeline and Backlog module that was a part of the greater DCI Construction® software. (Ex. 3, Dr. Moore Dec., at ¶8.) The Pipeline and Backlog module would provide tracking and visibility for opportunities in the pipeline, a backlog of work awarded but not yet completed, and capture project and bid history. (ECF 46-2.) Fortech and MCA engaged in numerous discussions and exchanged documents and examples that defined the expectations for how the module would function, the flow of a project through the module, the various user-types and access levels to be created, types of reports, dashboard features, and other functions that Fortech would develop. (*Id*.)

From the beginning, MCA told Fortech that this module was a part of a greater project. (Ex. 3, at ¶9.) MCA planned for Fortech to perform most, if not all, of the work to develop DCI Construction®, and it started with Phase 1 – the Pipeline and Backlog module. (*Id*. at ¶10.) MCA envisioned that the Pipeline and Backlog module could work as a stand-alone module, so that a client had the option to purchase the entire software, or just this module. (*Id*. at ¶11.) In November 2020, Fortech estimated that the Phase 1 work could be performed in 1,318 hours over 3.5 months, within a budget of $54,495. (ECF 46-2.) By March 2021, there were no quantifiable deliverables and no clear plan to complete the "go live" final delivery according to

11

the schedule promised by Fortech. (*Id.*) The project was also grossly overbudget. (*Id.*) Fortech issued MCA $65,404 in invoices between January 2021 and April 2021. (*Id.*)

During the project, Fortech blamed MCA for delays (and now hides behind the broad agile methodology) when MCA had to repeatedly correct Fortech's work. By way of example, at one point well into the project development, MCA had to direct Fortech to fix how money was displayed in the program (a program that would track the flow of money) because Fortech repeatedly put the decimal point in the wrong place. (*Id.*) When Fortech utterly failed to deliver a usable product, MCA took corrective action by terminating the contracts in August 2021, eight months after the project started. In total, Fortech issued MCA invoices for $221,213.50 between January and August 2021. (*Id.*) What Fortech promised to be a three-and-a-half-month, approximately fifty-five thousand dollar project turned into an eight-month, nearly a quarter of a million dollar nightmare for MCA.

## C.  MCA's Post-Termination Work On the Module Is Inextricably Linked To The Greater DCI Construction® Software.

That was not all. MCA was left with an unusable project that it had to salvage. Toward the end of Fortech's work on the module, MCA had three of its own employees working on the development of the module because it had become clear that Fortech could not perform as promised. (Ex. 3, at ¶13.) Those three remained on the project to deliver the module that Fortech was supposed to provide. (*Id.* at

¶14.) All three of those individuals were bound by confidentiality agreements. (*Id*. at ¶15.) MCA continued to use the Jira® tool within the Atlassian suite and each had their own unique credentials through which they could access this tool. (*Id*. at ¶16.) Instead of using Figma® as an Interface Design Tool to create mockups of the User interface, which Fortech used, MCA began using, and still uses, Lucidchart to create flowcharts and diagrams related to the development of the module and software. (*Id*. at ¶17.) Additionally, MCA moved the Code from the LiquidWeb repository to an Azure repository.  (*Id*. at ¶18.) Lucidchart has drawings of MCA's future plans for user interface with the Pipeline and Backlog module and the greater DCI Construction® software. Access cannot be segmented to just the Pipeline and Backlog module. (*Id*. at ¶19.)

By August 2022, the Pipeline and Backlog module was finally corrected enough to be released for potential clients to use it. (*Id*. at ¶20.) However, as a part of developing this module, MCA started to develop the other parts of the DCI Construction® software with which the Pipeline and Backlog module would work. (*Id*. at ¶21.)  DCI Construction® will have multiple modules and the Pipeline and Backlog module was first. (*Id.*) The Pipeline and Backlog module is the initial beachhead/centerpiece of the DCI Construction® software, but it can still be used independently from the rest and has not undergone major changes to its structure after its initial release in August 2022. (*Id*. at ¶22.) For this litigation, MCA has

13

separated the work underlying the Pipeline and Backlog module from the work underlying the rest of the DCI Construction® components. (*Id*. at ¶23.) However, it could not separate the connection to the Change Log and cannot provide any more access without also providing access to features within the greater DCI Construction® software, including mockups and plans for this one-of-a-kind software. (*Id*. at ¶23.) The DCI Construction® software is still in development and is not available in the open market.  (*Id*. at ¶24.)

**D.     Fortech Is Now Part of A Multi-National Foreign Conglomerate And Directly Competes With MCA in Software Development Within the Construction Industry In The United States.**

When Fortech worked on the Pipeline and Backlog module for MCA, it was a Romanian-based software development company, as far as MCA was aware. (Ex. 2, at ¶28.) To protect MCA's proprietary and unique ideas from threat of competition, the contracts between MCA and Fortech contained various confidentiality provisions. (*Id*. at ¶29.)  MCA also believed that it, and not Fortech, would own the work product and source Code that resulted from the work performed by Fortech. (*Id*. at ¶30.) Thus, even if Fortech performed work for other entities, MCA was reassured that Fortech could not steal MCA's ideas. (*Id*. at ¶31.) That threat was real. Indeed, MCA recently discovered that Fortech holds itself out as a "master" in software engineering for products geared toward the construction industry. (ECF 56-1.) In June 2022, Fortech posted on its website a brochure

bragging about a "Cloud-based software [it] developed to help contractors, from residential-focused construction businesses to corporate-level companies, manage projects, design proposal templates, simplify workflows, and save valuable time by automating manual processes." (*Id.*)

One month after publishing that brochure, Fortech sued MCA for breaching the contracts between MCA and Fortech. (ECF 1.) Fortech alleges that MCA has no right to the work for which it paid and that was the result of its unique concept. (*Id.*) Four months later, Fortech apparently executed a definitive agreement with GlobalLogic, a Hitachi Group Company. (ECF 56-2.) Hitachi, Ltd. is a multinational conglomerate with a dominant presence in industries including information technology, software development, electronics and power systems. (*See* www.Hitachi.com) On February 1, 2024, Fortech announced that its *merger* with GlobalLogic was complete. (ECF 56-2.) The acquisition was purportedly completed in February 2023 and the "legal merger" completed in February 2024. (*Id.*) Fortech is now among the "1200 team member" GlobalLogic team that is comprised of "77% Mid, Senior & Expert roles." (*Id.*) GlobalLogic boasts that it "operates design studios and engineering centers around the world, extending our deep expertise to customers in the automotive, communications, financial services, healthcare & life sciences, media and entertainment, manufacturing, semiconductor, and technology industries." (www.globallogic.com/about/.) Now, with Fortech, it will add

construction to that list, if it's not already there. Additionally, GlobalLogic is a part of the larger Hitachi Group, which is headquartered in Japan and includes hundreds of companies under its umbrella around the word. (Ex. 4, Hitatchi Group Companies.) By contrast, MCA is based in Michigan and currently employs approximately twenty individuals. (Ex. 2.) Fortech is represented by two law firms. Sheehan Phinny Bass and Green's website lists 71 attorneys across five offices and Dykema Gossett in Michigan's website lists over 300 people in 14 offices.

## RELEVANT PROCEDURAL HISTORY

This Court is well-aware of the procedural history in this matter given the extensive briefing over discovery issues in the last few months. Thus, MCA will focus herein only on that which directly pertains to this motion. Specifically, on October 30, 2023, Fortech filed its Second Motion to Compel in which it sought (among others) an order "[c]ompelling MCA to…allow Fortech to evaluate changes made to the agreed Specifications and to the Code after termination of the parties' agreement, in light of MCA's claim for damages incurred to 'deconstruct, fix and rewrite' the Code." (ECF 44 at PAGEID.731.) Fortech argued that it needed to "see what the Code looked like post-termination, too" and "review that post-termination code to confirm that its work product is not being utilized and that the code being sold meets the Specifications." (ECF 44 at PAGEID.753.) MCA objected that the source Code was proprietary and argued that producing the code that MCA

developed after Fortech left the project would "effectively hand Fortech (a software developer with likely hundreds of clients who could benefit from the proprietary work product) with the keys to a system that is now beyond the scope of what Fortech promised to develop in Phase 1." (ECF 46 at PAGEID.841.) In its Reply Brief, after Fortech argued that access to the pre-termination software necessarily means "complete access" to everything that resides in MCA's systems because a "snapshot" was not enough, Fortech then argued that MCA could "not refuse to provide Fortech with access to the purportedly fixed Code and associated Specifications." (ECF 47 at PAGEID.877.) On January 1, 2024, the Magistrate Judge entered an Order Granting Fortech's Second Motion to Compel. (ECF 48.) In that Order, the Magistrate Judge combined the arguments related to pre (or near) termination "access" with requests for post-termination Code. The Magistrate Judge held that "the source code, both before and after contract termination, is relevant…" (ECF 48 at PAGEID.885.) But then, broadly ordered that the "issue of access to the software code is granted." (*Id*. at PAGEID.888.) The Magistrate Judge also rejected MCA's alternative request that any post-termination production be made only to a third-party expert, stating that MCA did not request protection and had not made a sufficient showing if it had. (*See id.*)

While MCA believed that the Order required only the production of the "Code" post-termination (among other things), its counsel contacted Fortech's

counsel to determine if they had a different interpretation. Unsurprisingly, they did. Fortech's counsel insisted that the order meant Fortech should be able to get "unfettered access" to MCA's systems, including anything that could exist related to the post-termination activity. MCA filed objections to the Magistrate Judge's order and, despite its confidentiality concerns, produced the post-termination Code for the Pipeline and Backlog module. (Ex. 1, February 12, 2024 Email.) It also produced access to the web application that depicts the Pipeline and Backlog module from an end-user's perspective, as it would appear today. (*Id*.) Undeterred, Fortech argued in response to MCA's objections that Fortech and MCA are not competitors and that "access to all of the software used to 'deconstruct, fix and rewrite' the Code is necessary given MCA's counterclaim." (ECF 54 at PAGEID.964.) MCA filed a reply brief on March 1, 2024 in which it stated its intention to file the instant motion to protect itself from any further expansion of post-termination discovery.

## <u>LEGAL STANDARD</u>

A party may move for a protective order to protect it from "annoyance, embarrassment, oppression, or undue burden." Fed R. Civ. P. 26(c)(1). The movant must show good cause for a protective order. *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir., 2001) "To show good cause, the movant must articulate specific facts showing 'clearly defined and serious injury resulting from the discovery sought and cannot rely on mere conclusory statements.'" *Encompass Pet Group, LLC v. Allstar*

*Prod Group, LLC*, 2023 U.S. Dist. LEXIS 7024, at *12 (E.D. Mich., Jan. 13, 2023))(quoting *Nix, supra.)*. "Good cause cannot be established upon some general or speculative alleged harm." *Id.* (quoting *Flagg v. City of Detroit*, No. 05-74253, 2010 U.S. Dist. LEXIS 78501, 2010 WL 3070104, at *3 (E.D. Mich. Aug. 4, 2010).).

## **ARGUMENT**

### A.     **This Court Should Preclude Any Further Post-Termination Production.**

A district court may require that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). MCA requests that this Court preclude the further disclosure into any of its post-termination processes, information, systems, communication or other documents. MCA has produced its post-termination Code and a login to the Pipeline and Backlog module web application so that Fortech can interact with the module as though it is the end user. (Ex. 1.) MCA produced a similar login to the Pipeline and Backlog module web application that was the result of Fortech's last release. Thus, Fortech can interact with the "end result" and can see for itself how they are different. Additionally, Fortech was responsible for creating the specifications to produce the Code and make MCA's vision a reality. Fortech has complete access to the tools that it used during its work on the Pipeline and Backlog module. So, Fortech can: a) identify the Specifications; b) compare the Specifications to every second of the time in which Fortech worked

on the module (assuming Fortech did not delete things while it worked or save information locally to which MCA has no access); c) compare the Specifications to the Code and the end-user experience right around the time of termination; and d) compare the specifications to the Code and the end-user experience today.

Thus, Fortech's discovery needs have been met. Further discovery into MCA's post-termination proprietary trade secrets and development work would be impermissible oppression and could equate to stealing MCA's work in development.

**B.    If This Court Finds That Any Remaining Post-Termination Discovery Is Required, It Should Order The Production To A Third Party Expert under An AEO Designation.**

An attorney-eyes-only ("AEO") designation, limits review of documents to only the parties' attorneys and experts. "The party seeking an AEO designation must "identify with sufficient particularity the harm that it will suffer." *Stout v. Remetronix, Inc.*, 298 F.R.D. 531, 535 (S.D. Ohio, 2014). An "AEO designation can be justified upon a specific factual showing that 'especially sensitive information is at issue or the information is to be provided to a competitor.'" *Stout*, 298 F.R.D. at 535 (quoting *United States ex rel. Daugherty v. Bostwick Labs*., No. 1:08-cv-354, 2013 U.S. Dist. LEXIS 89683, 2013 WL 3270355, at *2 (S.D. Ohio June 26, 2013).). When sensitive business information and/or trade secrets are at issue, courts examine the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in

20

the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Vignes-Starr v. Lowe's Home Ctrs.*, 544 F. Supp. 3d 774, 776 (W.D. Ky. 2021). "[A] specific showing of competitive harm" is sufficient for AEO designation. *Bostwick Labs.*, 2013 U.S. Dist. LEXIS 89683, at \*18 (ordering that documents with laboratory service pricing and those which revealed market strategy and other non-public information should be produced only under an AEO designation because of the irreversible competitive advantage that producing them to the opposing parties would pose.). "[C]ompetitive harm may result when the person accessing the proprietary information is involved in competitive decision-making. *Ross-Hime Designs, Inc. v. United States*, 109 Fed. Cl. 725, 731 (2013).

The issues in this case are similar to those in *Deloitte Tax LLP v. Murray*, No. 1:20-CV-02487, 2022 U.S. Dist. LEXIS 81243, at \*19 (N.D. Ohio May 4, 2022). There, Deloitte Tax LLP sued a former employee alleging that the employee secretly formed a start-up company while employed at Deloitte Tax and used the company's proprietary information to build a competitive software tool. Deloitte Tax filed a motion for protective order to designate several categories of documents as AEO including "[s]ource code development records" for its software. *Id.* at \*7. The

21

defendants argued that they needed the source code and related technical evidence to compare to the defendant's code and show there was no misappropriation. *Id.* The plaintiff argued that the defendants did not have access to this information when employed by Deloitte Tax, and so should not get direct access to the information through the lawsuit. *Id.* The court found that Deloitte Tax demonstrated "the inherent risk associated with disclosing its proprietary source code and source code development materials to [the defendants] outweighs the prejudice that may result from excluding [their] direct access to these materials." *Id*. at *20. The court ordered the production of the source code and technical documents under an AEO designation and to a third-party expert. Here, MCA is a leader in research and development in the construction industry. Its DCI Construction® software is the result of decades of experience, skill and expertise, honed largely by the very people who own and/or manage MCA today. MCA's expertise is unmatched in its industry and it has literally set the standard for how construction companies can increase productivity and efficiency across the board. There is nothing like the DCI Construction® software in the market today. Critically, Fortech had no access to the larger DCI Construction® project and how the Pipeline and Backlog module fit therein. MCA cannot extricate the Pipeline and Backlog module from any post-termination technical documents that it has not already produced and it should not be forced to give Fortech complete access to its proprietary work.

Moreover, the same time that it worked with MCA on the Pipeline and Backlog module, Fortech worked with another construction-based client to create software to help contractors "manage projects, design proposal templates, simplify workflows, and save valuable time by automating manual processes." (ECF 56-1.) Shortly after Fortech sued MCA, claiming that it is entitled to the work it performed for MCA, Fortech merged with a global conglomerate with limitless resources. Fortech's counsel has engaged in a no-stone unturned document production strategy against MCA all while refusing to take any depositions. Meanwhile, Fortech's counsel has ignored MCA's counsel's requests for the merger documents. Thus, MCA cannot determine whether Fortech even has standing to assert its claims or, far worse, if Fortech's status in the Hitachi umbrella puts MCA's proprietary ideas and work product at risk of even greater competition than it feared. Indeed, Fortech never had any rights or access to the greater DCI Construction® software and it should not be afforded the ability to look behind that curtain under the guise of this lawsuit. A software developer of the caliber that Fortech and GlobalLogic boasts they have would easily be able to look at MCA's post-termination Code of the Pipeline and Backlog module and retain knowledge about its structure. If that software developer has knowledge of MCA's post-termination Code and any information at all about how the Pipeline and Backlog module fits within the greater DCI Construction® software, that software developer has insight into a first-of-its-kind program. If that

23

software developer has any experience in the construction industry, MCA could be pushed out of the market before it even exists. Moreover, MCA has no ability to ascertain what safeguards exist to prevent Fortech (or whatever it is now known as) from making MCA's data available to entities within the Hitchi umbrella, who are not parties to this case, likely not subject to this Court's jurisdiction or to U.S. law and not parties to any confidentiality agreement. This concern is not speculative. Just last year, President Biden signed the Protecting American Intellectual Property Act of 2022, which is aimed at reducing the theft of trade secrets of U.S. persons by foreign entities or individuals. 50 U.S.C.S. § 1709.

## **CONCLUSION**

For the reasons stated herein, MCA respectfully requests this Court enter an order 1) prohibiting further discovery into MCA's post-termination documents or, in the alternative, 2) order that any further post-termination document production and discovery be protected under an AEO designation.

Respectfully submitted,
MYERS & MYERS, PLLC
Attorneys for Defendant/Counter-Plaintiff

Dated: March 13, 2024

/s/ Kristyn R. Mattern
Kristyn R. Mattern (P77548)
915 N. Michigan Ave., Suite 200
Howell, Michigan 48843
(517) 540-1700